**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Northern Division*

WALMART REAL ESTATE                     \*
    BUSINESS TRUST, *et al.*,
                                   \*

    Plaintiffs,
                                   \*

v.                                                          \*          Case No.: DLB-18-3664

QUARTERFIELD PARTNERS, LLC, *et al.*,
                                   \*

    Defendants.
                                   \*

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

This case involves a dispute over the terms of a purchase option provision in a ground lease.[1]

In 2005, Plaintiffs Walmart Real Estate Business Trust ("Walmart") and Sam's Real Estate

Business Trust ("Sam's") each executed a ground lease ("Walmart Lease" and "Sam's Lease") with

Defendants Quarterfield Partners LLC, BL Quarterfield Associates LLC, Q.O.P. Properties LLC,

and Quarterfield Office Park LLC (collectively, "Quarterfield"). Walmart Lease, ECF No. 55-3;

Sam's Lease, ECF No. 55-4.[2] Each lease pertains to a different parcel of real property that

Quarterfield owns in Anne Arundel County, Maryland ("Walmart Parcel" and "Sam's Parcel").

The leases grant Walmart and Sam's the right to build and operate their stores on the properties.

Am. Compl. ¶¶ 11, 31, ECF No. 34. The last section of the lease, Section 27, provides, in part,

---

[1] The parties consented to the reassignment of this case to a magistrate judge for all proceedings. ECF Nos. 19, 26, 27. Judge Gallagher presided over this case until she was elevated to the District Court, and it was reassigned to me on October 7, 2019.

[2] The Walmart Lease and Sam's Lease, signed on the same day, have different rent payments and concern different parcels of land. In all other respects they are essentially identical, and to the extent they differ, their differences are not material to this dispute. For convenience, the Court will cite only the Walmart Lease and generally refer to the lease in the singular.

"Lessor hereby grants to Lessee an option to purchase the Premises from Lessor on the terms and conditions set forth herein (the 'Option')." Walmart Lease § 27, at 17. This purchase option provision is the crux of this lawsuit.

On November 29, 2018, Walmart filed suit seeking a declaratory judgment (Count I), breach of contract (specific performance) (Count II) and breach of contract (damages) (Count III). ECF No. 1. On February 14, 2019, an amended complaint was filed, adding Sam's as a plaintiff. Am. Compl., ECF No. 34. In the amended complaint, Walmart and Sam's claim they attempted to exercise their options to purchase the properties pursuant to Section 27 of the lease, but Quarterfield has refused to sell. Plaintiffs ask the Court to declare that the purchase option provision is valid and enforceable and that they "executed their options to purchase the Walmart and Sam's . . . Properties such that they possess the right to purchase Plaintiffs' Parcels at the defined prices pursuant to the Purchase Agreements." *Id.* at 11. Additionally, plaintiffs ask the Court to order Quarterfield "to convey the Walmart and Sam's . . . Parcels to Walmart and Sam's . . . pursuant to the terms of the Purchase Agreements." *Id.* at 12.

Before discovery began, Quarterfield moved to dismiss the amended complaint, arguing that under the unambiguous language of the lease's option provision, plaintiffs did not have the option to purchase the property unless and until Quarterfield provided them with notice of the option term, and that, in any event, plaintiffs had missed the window for the option term by several years. ECF Nos. 17, 39. The motion to dismiss was denied. ECF Nos. 42, 43. In her April 12, 2019 Memorandum Opinion, Judge Gallagher aptly observed that "[t]he option clauses at issue are not models of clarity." *Walmart Real Estate Bus. Tr. v. Quarterfield Partners, LLC*, No. 18-3664-SAG, 2019 WL 1585320, at *5 & n.3 (D. Md. Apr. 12, 2019). Because Judge Gallagher concluded that

the leases were ambiguous, she denied Quarterfield's motion to dismiss so that the parties could engage in discovery. *Id.* at *6.

The parties now have completed discovery and filed cross-motions for summary judgment. ECF Nos. 55, 56.[3] Walmart and Sam's ask the Court to enter judgment in their favor on their claims for a declaratory judgment and specific performance for breach of contract. Quarterfield seeks judgment in its favor on all counts.

Having reviewed the lease and the record, the Court finds that the plain and unambiguous language of Section 27 of the lease grants Walmart and Sam's an enforceable option to purchase the property during the option term. The Court further finds that the lease is ambiguous as to when the option term began, but after consideration of extrinsic evidence, the Court finds that the option term began at the end of the tenth year after the date the stores opened for business and plaintiffs began paying defendants significant annual rent. Additionally, the Court finds that based on the unambiguous language of the lease, Quarterfield was obligated to send plaintiffs notices of the commencement of the option term, but it failed to do so, in breach of the lease. Because plaintiffs timely attempted to exercise their right to purchase the properties, they have not waived their rights under the lease and are entitled to declaratory relief and specific performance. Accordingly, plaintiffs' motion for partial summary judgment is granted. Quarterfield's motion for summary judgment is denied.

---

[3] The parties fully briefed the motions. ECF Nos. 55-1, 56-1, 57, 58; *see also* ECF Nos. 64–66. A hearing is not necessary. *See* Loc. R. 105.6.

**Factual Background**[4]

On April 6, 2005, Walmart and Sam's each entered into a ground lease with Quarterfield, in which Quarterfield granted them the right to build and operate stores on separate parcels of real property that Quarterfield owns in Anne Arundel County, Maryland. Walmart Lease; Sam's Lease. The lease states that the "initial term of this Lease shall be for a period commencing on the Effective Date and terminating on the date that is twenty (20) years after the Rent Commencement Date, unless sooner terminated or extended (the 'Initial Term')." Walmart Lease § 2(c), at 3. The Effective Date for both leases is April 6, 2005, the date the last party executed each lease. *Id.* at 1. The 120-day period after the Effective Date was the "Study Period," during which plaintiffs could terminate their leases "for any reason or for no reason." *Id.* § 19, at 10–11.

During the three years following the execution of the lease, Walmart and Quarterfield executed fourteen amendments to the Walmart Lease, each extending the Study Period. Fourteenth Am., ECF No. 55-7; Pls.' Mem. 5; Defs.' Mem. 5. The fourteenth amendment provided that Walmart "opened for business on March 5, 2008" and the "Rent Commencement Date is March 5, 2008." Fourteenth Am. Sam's and Quarterfield executed seventeen amendments to the Sam's Lease, each extending the Study Period. ECF No. 55-8; Pls.' Mem. 5; Defs.' Mem. 5, 8. The seventeenth amendment provided that Sam's "opened for business on February 21, 2008" and the "Rent Commencement Date is February 21, 2008." Seventeenth Am.

The lease provided that plaintiffs were required to pay a nominal monthly rent of $100.00 "from the Effective Date until the earlier of (i) the Rent Commencement Date or (ii) termination of

---

[4] In ruling on cross-motions for summary judgment, this Court "resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Wheelabrator Baltimore, L.P. v. Mayor & City Council of Baltimore*, No. GLR-19-1264, 2020 WL 1491409, at *4 (D. Md. Mar. 27, 2020) (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).

th[e] Agreement by Lessee." Walmart Lease § 3(a). Alternatively, plaintiffs could "elect to make a lump sum rent payment" of $1,000.00, instead of $100.00 per month, and the "lump sum payment [would] serve as the rent . . . for the period from the Effective Date until the earlier of the Rent Commencement Date or termination of th[e] Lease by Lessee." *Id.* The lease defines "Rent Commencement Date" as "the earlier of (i) the date on which regular business is first conducted from Lessee's building . . . on the Premises or (ii) the date that is twelve (12) months after the . . . 'Possession Date' . . . ." *Id.* § 2(b), at 2–3. The lease provides that after the Rent Commencement Date, "[d]uring the Initial Term," Walmart will pay annual rent of $772,021.34 ($619,524.00 for Sam's) "from and after the Rent Commencement Date . . . [d]uring the initial twenty (20) year term." *Id.* § 3(b). During the nearly three-year Study Period before the businesses opened on the Rent Commencement Date, Walmart and Sam's each paid Quarterfield monthly rent payments of $100.00. Guy Aff. ¶ 13, ECF No. 56-5; Pls.' Mem. 7. After the businesses opened, Walmart and Sam's paid Quarterfield annual rent payments of $772,021.34 and $619,524.00, respectively.

The final section of the lease, Section 27, gives rise to the dispute in this case. Section 27, titled "Option to Purchase," states:

> From the end of the tenth (10th) year of this Lease until the end of the eleventh (11th) year of this Lease (the "Option Term"), Lessor hereby grants to Lessee an option to purchase the Premises from Lessor on the terms and conditions set forth herein (the "Option"). Notwithstanding the foregoing, the Option Term shall not commence until Lessor sends to Lessee two (2) thirty (30) day notices of the commencement of the Option (the "Option Notice"). In the event Lessor fails to send such notice at the end of the ninth (9th) year of this Lease, then the Option Term shall be moved such that it is for a one year period commencing thirty (30) days after the Second Option Notice has been received by Lessee. Lessee may exercise the option to purchase the Premises by providing thirty (30) days notice to Lessor of its election to exercise the Option (the "Option Notice"). In the event Lessee elects to exercise the Option, (i) the purchase price of the Premises (the "Purchase Price") shall be the product of the annual rent at the time of the Option Notice divided by .0825, for example, during the eleventh (11th) year of the Initial Term of the Lease, the Purchase Price shall be $772,021.34 divided by .0825 or Nine Million Three Hundred and Fifty Seven Thousand Eight Hundred Thirty Four and 43/100 Dollars

($9,357,834.43), and (ii) the remainder of the terms and conditions of the purchase and sale of the Premises shall be as set forth in the purchase agreement attached hereto as **Exhibit J** and incorporated herein (the "Purchase Agreement"). Lessor and Lessee shall negotiate in good faith any additional terms or conditions required by any material changes of law (other than changes in the tax law) that may occur between the date hereof and the Closing, as defined in the Purchase Agreement. In the event that the parties cannot come to an agreement on any such additional terms or conditions within five (5) business days of a request by either party for the incorporation and modification of terms, either company may notify the other that the matter will be submitted for arbitration to a panel of three real estate experts, each of whom shall be experienced in negotiating agreements for the purchase and sale of the type of property subject to this Lease. Lessor and Lessee shall each select and fully compensate one of these real estate experts and the third shall be selected by the other two and compensated in equal shares by Lessor and Lessee. The panel's decision will be binding on the parties without further rights of appeal.

Walmart Lease § 27, at 17 (emphasis in original); *see* Sam's Lease § 27, at 16–17 (differing from Walmart Lease only in that the rent during the eleventh year was $619,524.00 and the example Purchase Price was $7,509,381.82).

On May 31, 2018, ten years and three months after Walmart opened for business, Walmart's attorney, Pamela Belleman, sent a demand letter to Quarterfield, citing the lease's option provision, noting that Quarterfield had not sent the Option Notices to Walmart and asking it to do so. Demand Ltr., ECF No. 55-9. In response, Quarterfield did not issue the Option Notices. Pls.' Mem. 6; Defs.' Mem. 6. On September 19, 2018, even though Quarterfield had not sent the Option Notices, Walmart attempted to exercise its option to purchase the property. Ltr. from Belleman to Def. Counsel, ECF No. 55-10; Pls.' Mem. 6; Defs.' Mem. 19–20. Quarterfield refused to sell. On January 24, 2019, ten years and more than eleven months after Sam's opened for business, Sam's, like Walmart, attempted to exercise its option to purchase the property, even though Quarterfield had not sent Option Notices to Sam's. Ltr. from Belleman to Def. Counsel, ECF No. 55-11; Pls.' Mem. 6; Defs.' Mem. 19–20. Quarterfield again refused to sell. This suit followed.

## Analysis

### I.      Standard of Review

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[,] . . . admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A).  Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The opposing party must identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 251.  Although "a court should not weigh the evidence," *Perkins*, 936 F.3d at 205 (quoting *Anderson*, 477 U.S. at 249), if "a party fails to establish the existence of an element essential to that party's case" or "'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,'" then summary judgment is proper, *id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23.  In ruling on cross-motions for summary judgment, this Court must "review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Wheelabrator Balt., L.P. v. Mayor & City Council of Balt.*, No. GLR-19-1264, 2020 WL 1491409, at *4 (D. Md. Mar. 27, 2020) (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).

In breach of contract cases, when the parties dispute the meaning of an ambiguous contract on summary judgment and there is extrinsic evidence that is "dispositive of the interpretative issue,"

such that there is no genuine dispute, the Court may resolve the contractual ambiguity on summary judgment. *Sprint Nextel Corp. v. Wireless Buybacks Holdings, LLC*, 938 F.3d 113, 131 (4th Cir. 2019) (quoting *Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007)).   But, "[i]f . . . resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must . . . be refused and interpretation left to the trier of fact." *Id.* (quoting *Wash. Metro.*, 476 F.3d at 235); *see also W. C. English, Inc. v. Rummel, Klepper & Kahl, LLP*, 934 F.3d 398, 404–05 (4th Cir. 2019) (concluding that summary judgment was improper on the record before it because the parties disputed a contractual provision, the interpretation proposed by the party opposing summary judgment was "at the very least, reasonable," and, "while the district court was authorized to construe unambiguous language as a matter of law, it could not resolve genuine disputes regarding the meaning of ambiguous contractual language against the nonmoving party on summary judgment").

## II.       Principles of Maryland Contract Law

Maryland contract law governs the lease.   Walmart Lease § 24(d), at 15.   "[T]he interpretation of a contract is ordinarily a question of law for the court." *Jos. A. Bank Clothiers, Inc. v. J.A.B.-Columbia, Inc.*, No. ELH-15-3075, 2017 WL 6406805, at *7 (D. Md. Dec. 15, 2017). The Court must look to the four corners of the contract and "ascribe to the contract's language its customary, ordinary, and accepted meaning." *Rockledge Assocs. LLC v. Transamerica Life Ins. Co.*, No. PWG-16-710, 2017 WL 1239182, at *5 (D. Md. Feb. 3, 2017) (quoting *Dynacorp Ltd. v. Aramtel Ltd.*, 56 A.3d 631, 670 (Md. Ct. Spec. App. 2012)).   The Court must consider "what a reasonable person in the position of the parties would have thought [the language] meant," not "what the parties thought that the agreement meant or intended it to mean," and it "must presume

that the parties meant what they expressed." *Calomiris v. Woods*, 727 A.2d 358, 363 (Md. 1999)

(quoting *Gen. Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1310 (Md. 1985)).  Thus, even

though "the cardinal rule of contract interpretation is to give effect to the parties' intentions," the

Court does so based solely on the language of the contract, unless the language is ambiguous.

*Rockledge*, 2017 WL 1239182, at *5 (quoting *Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery

Co.*, 73 A.3d 224, 232 (Md. 2013)), *aff'd,* 717 F. App'x 222 (4th Cir. 2018).

The Court "determine[s] whether a contract is ambiguous."  *Jos. A. Bank*, 2017 WL 6406805,

at *7.  "[A] written contract is ambiguous if, when read by a reasonably prudent person, it is

susceptible of more than one meaning." *Calomiris*, 727 A.2d at 363; *see also Putsche v. Alley Cat

Allies, Inc.*, No. PWG-17-255, 2018 WL 784615, at *11 (D. Md. Feb. 8, 2018) (same).  "An

ambiguity does not exist simply because a strained or conjectural construction can be given to a

word." *Rockledge*, 2017 WL 1239182, at *6 (quoting *Dumbarton*, 73 A.3d at 233).  Nor is a

contract ambiguous "simply because, in litigation, the parties offer different meanings to the

language." *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 929 A.2d 932, 952 (Md.

2007).

When interpreting ambiguous language in a contract, the Court considers "the character of

the contract, its purpose, and the facts and circumstances of the parties at the time of execution."

*Calomiris*, 727 A.2d at 363 (quoting *Pacific Indem. v. Interstate Fire & Cas.,* 488 A.2d 486, 488

(Md. 1985)).  In doing so, "the court must consider any extrinsic evidence which sheds light on the

intentions of the parties at the time of the execution of the contract." *Putsche*, 2018 WL 784615,

at *11 (quoting *Jos. A. Bank*, 2017 WL 6406805, at *9); *see also Calomiris*, 727 A.2d at 363

("[W]hile evidence of prior intentions and negotiations of the parties is inadmissible, the parol

evidence rule would not bar a court from considering the context of the transaction or the custom

of the trade in a determination of ambiguity.").  If that "evidence presents disputed factual issues," then "construction of the ambiguous contract is for the jury."  *Pac. Indem. Co.*, 488 A.2d at 489; *see also Rockledge*, 2017 WL 1239182, at *6 ("[If] there is a *bona fide* ambiguity in the contract's language or legitimate doubt as to its application under the circumstances . . . the contract [is] submitted to the trier of the fact for interpretation." (quoting *Bd. of Educ. of Charles Cty. v. Plymouth Rubber Co.*, 569 A.2d 1288, 1296 (Md. Ct. Spec. App. 1990))); *see also Sprint Nextel Corp. v. Wireless Buybacks Holdings, LLC*, 938 F.3d 113, 131 (4th Cir. 2019) (noting that "if the contract remains ambiguous even after examining all available extrinsic evidence," then the ambiguity must be resolved against the drafter).  But, when the extrinsic evidence resolves the ambiguity without presenting a genuine issue of material fact, the Court may construe the contract. *Pac. Indem. Co.*, 488 A.2d at 489; *see Rockledge*, 2017 WL 1239182, at *6.

### III.    Section 27, the Option Clause

Walmart and Sam's argue that, under the plain and unambiguous language of Section 27 of the lease, they were granted an option to purchase the property during the Option Term.  They argue that the Option Term, defined as "[f]rom the end of the tenth (10th) year of this Lease until the end of the eleventh (11th) year of this Lease," began at the end of the tenth year after the Rent Commencement Date, a date that marked the beginning of the store's operation and the payment of significant annual rent to Quarterfield.  Walmart and Sam's acknowledge the possibility of an ambiguity as to when the Option Term began, and they cite to extrinsic evidence that the parties intended for the Option Term to begin ten years after the Rent Commencement Date.  If, as plaintiffs argue, the Option Term began ten years from the Rent Commencement Date, it spanned from March 5, 2018 to March 5, 2019 for Walmart and from February 21, 2018 to February 21, 2019 for Sam's. Walmart and Sam's further claim that under the unambiguous terms of the lease, Quarterfield was

obligated to provide them with two notices of the Option Term and that it failed to do so in violation of its contractual obligations.   Plaintiffs argue that they have the right to waive the notice requirements and that they properly served Quarterfield with notice of their intention to exercise the purchase option under the lease within the Option Term, on September 19, 2018, when Walmart gave notice, and on January 24, 2019, when Sam's gave notice.

Quarterfield reads the contract differently.  Quarterfield argues that the same lease language unambiguously grants Walmart and Sam's an option to purchase the properties but only if Quarterfield, in its sole discretion, chooses to give them notice of the commencement of the Option Term, which it has declined to do.  Quarterfield further argues that, under the unambiguous language of the lease, the Option Term, if there is one, should be calculated not from the Rent Commencement Date, as plaintiffs argue, but from the earlier Effective Date, the date on which the lease was signed, and that plaintiffs' attempts to exercise their options to purchase the properties were several years too late.

### A. Section 27 Grants Walmart and Sam's an Option to Purchase the Properties

In their opening briefs, the parties debate whether Section 27 grants Walmart and Sam's a purchase option or a right of first refusal.  *Compare* Pls.' Mem. 17 (asserting that Section 27 granted plaintiffs a "bargained-for purchase option"), *with* Defs.' Mem. 12–13 (insisting that Section 27 granted plaintiffs "only a right of first refusal").   In its reply brief, Quarterfield abandons its characterization of Section 27 as the grant of a right of refusal.  Quarterfield instead argues that Section 27 granted plaintiffs a "limited purchase option" and insists that "the option to purchase is dependent on defendants' decision to sell the parcels."  Defs.' Reply 21.  The Court agrees with plaintiffs.

The plain and unambiguous language of the lease grants plaintiffs an option to purchase the land they are leasing.  Section 27, titled "OPTION TO PURCHASE," begins: "From the end of the tenth (10th) year of this Lease until the end of the eleventh (11th) year of this Lease ('Option Term'), Lessor hereby grants to Lessee *an option to purchase* the Premises from the Lessor on the terms and conditions set forth herein (the '*Option*')."  Walmart Lease § 27, at 17 (emphasis added). The only reasonable interpretation of this sentence is that Quarterfield, the lessor, "grant[ed]" Walmart and Sam's, the lessees, "an option to purchase the Premises" from Quarterfield "on the terms and conditions set forth herein."[5]  The terms and conditions of the "option to purchase the Premises" are found in the remainder of the option provision.

The remainder of the provision further supports the plain and unambiguous reading of the first sentence that Quarterfield "grant[ed]" plaintiffs "an option to purchase the Premises."  The section lays out the procedure by which the Option Term shall commence (after two notices are sent by Quarterfield to Walmart/Sam's) and the procedure by which Walmart/Sam's "may exercise the option to purchase the Premises" (by sending notice to Quarterfield "of its election to exercise the Option").  The option provision further provides, "[i]n the event [Walmart/Sam's] elects to exercise the Option," the formula for calculating the "purchase price of the Premises . . . shall be the product of the annual rent at the time of the Option Notice divided by .0825, for example, during

---

[5] The "Premises" is defined in the Walmart Lease as a "certain tract containing approximately twenty and nine hundred nineteen one thousandths (20.919) acres situated in Anne Arundel County, and State of Maryland, more particularly described on **Exhibit A** attached hereto . . . together with all appurtenant easements and rights accruing thereto for vehicular and pedestrian access, including all interest of Lessor to the center of any street adjoining said tract."  Walmart Lease § 1, at 2 (emphasis in original); *see* Sam's Lease § 1, at 2 (defining the Premises as "all of those certain tracts containing approximately (i) sixteen and fifty-five one thousandths (16.055) acres, and (ii) one and one hundred fifty-four one thousandths (1.154) acres in size ('Outparcel #6'), situated in Anne Arundel County, and State of Maryland more particularly described on Exhibit A attached hereto . . .").

the eleventh (11th) year of the Initial Term of the Lease, the Purchase Price shall be $772,021.34 divided by .0825 or . . . $9,357,83443." A purchase agreement is attached as an exhibit and "incorporated" into the lease. The option provision requires the parties to "negotiate in good faith any additional terms or conditions required by material changes of law . . . that may occur between the date hereof and the Closing, as defined in the Purchase Agreement." The provision concludes by setting forth arbitration procedures "[i]n the event that the parties cannot come to an agreement on any such additional terms or conditions . . ." of the Purchase Agreement.

Read in its entirety and giving the language its customary, ordinary, and accepted meeting, Section 27 of the lease clearly contemplated that Walmart and Sam's would have an option to purchase the properties during an option term after receiving notice of the option term from Quarterfield, and if Walmart and Sam's elected to exercise the option, the parties were obligated to negotiate in good faith a sale of the properties. The legal effect of the unambiguous contract language that "Lessor hereby grants to Lessee an option to purchase the Premises" is that Quarterfield gave Walmart and Sam's a "continuing offer to sell . . . which is irrevocable during the stated period." *Prince George's Cty. v. Silverman*, 472 A.2d 104, 111 (Md. Ct. Spec. App. 1984) (citing *Beall v. Beall*, 434 A.2d 1015 (Md. 1981)).

Quarterfield does not seriously dispute that the plain language of the first sentence of Section 27 grants plaintiffs an option to purchase the property. Instead, Quarterfield focuses on the second sentence of Section 27, which states: "Notwithstanding the foregoing, the Option Term shall not commence until Lessor sends to Lessee two (2) thirty (30) day notices of the commencement of the Option (the 'Option Notice')." Walmart Lease § 27. According to Quarterfield, this sentence means that Quarterfield has the unilateral right to determine whether it will send notices of the commencement of the Option Term and that the Option Term will not commence unless

Quarterfield issues the notices, which it has the unfettered right to withhold.  Defs.' Reply 20–21.  This argument is unpersuasive.   By its plain language, the second sentence establishes the requirement for two notices to issue before the Option Term commences and defines the term "Option Notice."   Although the sentence begins with "Notwithstanding the foregoing," the language that follows does not limit the option to purchase that was granted in the first sentence or make it dependent on Quarterfield's decision to sell.  Rather, the second sentence confirms that the parties intended that there would, in fact, be an Option Term but it would not commence until the notices were sent.  Quarterfield's interpretation of the second sentence, on which its case largely rises and falls, does not square with the text.  The option clause's second sentence cannot be interpreted to alter the plain and unambiguous language in the preceding sentence that Quarterfield "hereby grant[ed]" Walmart and Sam's "an option to purchase the Premises from [Quarterfield]."

Quarterfield's reading of the second sentence of Section 27 would effectively eliminate the language in the opening sentence that clearly granted plaintiffs the option to purchase the property.  If, as Quarterfield argues, it could determine, in its sole discretion, whether the Option Term commences by refusing to issue the Option Notices, it would render the option to purchase the properties revocable, which is contrary to the law stating that options are "continuing offers to sell" that "are irrevocable during the stated period." *Silverman*, 472 A.2d at 111 (citing *Beall*, 434 A.2d 1015).  An option is a "binding agreement" that "can compel a sale by the unwilling owner." *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 923 F. Supp. 2d 745, 749 (D. Md. 2013).  It is an "actual contract right to buy" for which "the property is ready to be sold and the buyer can force the owner to sell even in the absence of another offer to purchase," and "[i]t is contingent only upon the optionee's decision to purchase and the proper exercise of the option." *Elderkin v. Carroll*, 941 A.2d 1127, 1139 n.14 (Md. 2008); *see also David A. Bramble, Inc. v. Thomas*, 914 A.2d 136, 143–

14

44 (Md. 2007) (noting that under a "true option," the holder has the "unqualified power to compel a sale to him" (quoting Restatement of Property § 413, cmt. b (1944)).

Quarterfield's position that it alone can determine whether the Option Term commences by withholding the Option Notices also would render its grant of the option to purchase illusory.  *See Bindagraphics, Inc. v. Fox Grp., Inc.*, 377 F. Supp. 3d 565, 575 n.5 (D. Md. 2019) ("A promise is illusory if 'the promisor retains an unlimited right to decide later the nature or extent of his performance.'" (quoting *Cheek v. United Healthcare of the Mid-Atl., Inc.*, 835 A.2d 656, 662 (Md. 2003))).  Indeed, "[a]n unlimited right to determine how to perform, or whether to perform at all, negates the promise to perform." *Id.* (quoting *Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651, 670 (Md. 2009)).  Courts disfavor interpretations that render a contract illusory and will "generally prefer a construction which will make the contract effective rather than one which will make it illusory or unenforceable." *Affable Servs., LLC v. C-Care LLC*, No. SAG-19-02877, 2020 WL 1675920, at *4 (D. Md. Apr. 6, 2020) (quoting *Questar Builders*, 978 A.2d at 670); *see also Bindagraphics*, 377 F. Supp. 3d at 575 n.5; *Baltimore/Washington Constr. & Pub. Emp. Laborer's Dist. Council v. Whiting-Turner Contracting Co.*, 244 F. Supp. 3d 490, 497 (D. Md. 2017) (noting "the common law principle to prefer an interpretation that makes the contract effective rather than one rendering it illusory and unenforceable").

Quarterfield's interpretation of the second sentence of Section 27 also would render meaningless the extensive language in the remainder of the section discussing plaintiffs' right to elect to exercise its option, the calculation of the purchase price, the incorporation of a purchase agreement, the requirement to negotiate the terms of sale in good faith, and the arbitration requirements.  For these reasons, the Court will not adopt Quarterfield's interpretation.  *See*

*Calomiris*, 727 A.2d at 366 ("[w]here possible, courts should avoid interpreting contracts so as to nullify their express terms"); *see also Rockledge*, 2017 WL 1239182, at *5.

Thus, the Court finds that nothing in the second sentence of Section 27 eliminates, abrogates, or limits the language in the first sentence that plainly granted Walmart and Sam's an option to purchase the properties from Quarterfield. A reasonably prudent person could not read those sentences, in the context of the entire option clause, to have a different meaning. *See Putsche*, 2018 WL 784615, at *11. Accordingly, Section 27 of the lease is unambiguous insofar as it provides that Walmart and Sam's have an option to purchase the properties from Quarterfield during the Option Term.[6] *See id*.

### B. Quarterfield Had a Contractual Obligation to Provide Notice

Quarterfield argues that it was not obligated to send the Option Notices and that it could withhold them, and thus prevent the commencement of the Option Term, if it did not want to sell the properties. Defs.' Mem. 11–15. Plaintiffs argue that Quarterfield was obligated under the lease to issue the Option Notices, and that even if Quarterfield did not issue the notices, plaintiffs could waive the notices and exercise the option to purchase the properties without them. Pls.' Mem. 15–18.

Once again, the Court starts with the relevant language in the option clause:

> Notwithstanding the foregoing, the Option Term shall not commence until Lessor sends to Lessee two (2) thirty (30) day notices of the commencement of the Option (the "Option Notice"). In the event Lessor fails to send such notice at the end of the ninth (9th) year of this Lease, then the Option Term shall be moved such that it is

---

[6] Even if the second sentence of the option clause rendered the rest of the clause ambiguous as to whether it granted Walmart and Sam's an unconditional option, extrinsic evidence confirms the option was not conditioned on Quarterfield's desire to sell. Short Form Lease and Memorandum of Option, ECF Nos. 55-5, 55-6 ("In the Lease the Lessor also grants the Lessee an option to purchase the Premises at a purchase price set forth in the Lease between the tenth and eleventh lease year.").

for a one year period commencing thirty (30) days after the Second Option Notice
has been received by Lessee.

Walmart Lease § 27, at 17.  The provision does not state explicitly that Quarterfield "must" send
the notices or is "required" to send them.  It also does not state that the notices may be withheld "at
the discretion" of the landlord.  The parties certainly knew how to craft language that would grant
one party the right to make a determination or exercise a right in its sole discretion.  *See* Walmart
Lease § 19 ("if Lessee determines in its sole discretion that it will not be able to obtain licenses . . .";
"Lessee shall have the right, exercisable by notice to Lessor . . ."); *id.* § 20 ("Lessor may elect, by
written notice delivered to Lessee . . .").  The option clause language does, however, indicate that
there would be consequences (i.e., the Option Term would be moved) "in the event [Quarterfield]
fails" to send the notices at the end of the ninth year of the lease.  One cannot "fail" to do something
unless there was an obligation or expectation to perform in the first place.[7]  The clause also states
that the Option Term shall not commence "*until* Lessor sends" the notices.  It does not say that the
Option Term shall not commence "*unless* the Lessor sends" the notices or "*if* Lessor elects" to send
notices, both of which would suggest that Quarterfield could decide whether to issue them.  The
contract language, therefore, implies that Quarterfield had an obligation to send the notices and that
there was an expectation by the parties that Quarterfield would send them.  The only reasonable
interpretation of the language regarding the Option Notices is that the Option Term "shall not
commence" until the notices are sent and that Quarterfield had an obligation to send them.  It is
undisputed that Quarterfield never sent the notices, and when asked to do so, Quarterfield refused.
Quarterfield's refusal to issue the Option Notices was inconsistent with "its general obligations of

---

[7]  According to Merriam-Webster, the word "fail," when used as a transitive verb as it is here,
means "to disappoint the expectations or trust of," "to miss performing an expected service or
function," "to be deficient in," "to leave undone" or "neglect." *Fail*, Merriam-Webster.com,
http://www.merriam-webster.com/dictionary/fail (last visited July 10, 2020).

good faith and fair dealing." *Affable*, 2020 WL 1675920, at *4 (citing *Clancy v. King*, 954 A.2d 1092, 1106 (Md. 2008).

Interpreting the option clause to require the issuance of the notices is not only compelled by the plain and ordinary language in the lease, but it also results in a valid, enforceable contract provision. As discussed earlier, if the Court interpreted the notice language as Quarterfield argues, Quarterfield could elect not to give notice of the option at all, thereby unilaterally depriving plaintiffs of the benefit of the option. Such a result would be contrary to law. Options are for the benefit of the optionee (here, plaintiffs) and therefore cannot be unilaterally withdrawn by the optionor. *See Silverman*, 472 A.2d at 111; *Straley v. Osborne*, 278 A.2d 64, 68 (Md. 1971). Similarly, as discussed above, Quarterfield's reading would render the option illusory and unenforceable. It is clear from the contractual language that the parties intended for the option to be enforceable, even though Quarterfield hoped to have the ability to delay the sale. Therefore, the Court interprets the language to make the option enforceable and finds that Quarterfield had a contractual duty to provide notice, which it failed to do.[8] *See Affable*, 2020 WL 1675920, at *4; *Bindagraphics*, 377 F. Supp. at 575 n.5; *Questar Builders*, 978 A.2d at 670.

### C. The Commencement of the Option Term

Quarterfield argues that it was justified in refusing to send the Option Notices when Walmart and Sam's demanded them because the Option Term, if it existed, had elapsed and plaintiffs' attempts to exercise their options were untimely. Section 27 states that the Option Term is "[f]rom the end of the tenth (10th) year of this Lease until the end of the eleventh (11th) year of this Lease." Quarterfield argues that the end of the tenth year "of this Lease" means the end of the

---

[8] Given that Quarterfield was obligated to provide notice and failed to do so, the Court need not reach plaintiffs' argument that they could waive the notice provision.

tenth year after the lease was signed, that is, ten years after the Effective Date.   According to Quarterfield, if the Option Term began at all, it began on April 6, 2015, the end of the tenth year after the Effective Date and expired one year later on April 6, 2016.   Quarterfield argues that plaintiffs' attempts to purchase the properties in September 2018 and January 2019 were more than two years late.   Defs.' Mem. 19.   Walmart and Sam's argue that the end of the tenth year "of this Lease" means the end of the tenth year of the initial twenty-year term following the Rent Commencement Date.   According the plaintiffs, the Option Term began on March 5, 2018 for Walmart and February 21, 2018 for Sam's, dates that marked the end of the tenth year after the Rent Commencement Date.   Plaintiffs argue that their attempts to exercise their options in September 2018 (Walmart) and January 2019 (Sam's) fell within the one-year Option Term and were timely.   The Court agrees with plaintiffs.

When the lease is read in its entirety, as it must be, the Court finds that the language is ambiguous as to when "this Lease" began for purposes of defining the one-year period when plaintiffs had an option to purchase the property.   As Quarterfield notes, the preamble of the lease states that "THIS GROUND LEASE (this 'Lease' or 'Agreement') is made and entered into as of the 'Effective Date . . .'"  Walmart Lease 1.   According to Quarterfield, because "this 'Lease'" was "made and entered into as of the 'Effective Date,'" the end of the tenth and eleventh years "of this Lease" must mean the end of those years from the Effective Date.   At first blush, there is an appeal to this interpretation, but only if you ignore the rest of the option clause and the lease.   The language cannot be read in a vacuum.   *Rockledge*, 2017 WL 1239182, at *5 (Courts must construe the contract "in its entirety and, if reasonably possible, [give] effect . . . to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing

unless no other course can be sensibly and reasonably followed." (quoting *Dumbarton*, 73 A.3d at 232–33)).

In the latter part of the option clause, there is a reference to the "Initial Term of the Lease." It states, in relevant part, "for example, during the eleventh (11th) year of the *Initial Term of the Lease*, the Purchase Price shall be . . . ." Walmart Lease § 27 (emphasis added). "Initial Term" is defined in Section 2 of the lease: "The initial term of this Lease shall be for a period commencing on the Effective Date and terminating on the date that is twenty (20) years after the Rent Commencement Date, unless sooner terminated or extended (the 'Initial Term')." *Id.* § 2(c), at 3. Under this language, the Initial Term includes both the Study Period and the twenty-year period after the Rent Commencement Date, for a combined period of more than twenty years. In the "Rent" section, the lease provides that "[d]uring the Initial Term," Walmart will pay rent of $772,021.34 ($619,524.00 for Sam's) "from and after the Rent Commencement Date . . . [d]uring the initial twenty (20) year term." *Id.* § 3(b). Under this provision, the "initial twenty (20) year term" of the lease began on the Rent Commencement Date, unlike the Initial Term, which began on the Effective Date. The option clause does not state whether the eleventh year of "this Lease" began eleven years into the "Initial Term" or eleven years into the "initial twenty (20) year term." A reasonably prudent person could conclude that either meaning applied. *Calomiris*, 727 A.2d at 363.

Reading the option clause in the context of other lease provisions adds to the ambiguity. During the Study Period, which was after the Effective Date but before the Rent Commencement date, Walmart and Sam's paid only a token monthly rent and could terminate the lease "for any reason or for no reason." Walmart Lease § 19, at 10–11. The import of this language is that the lease, while in existence after the Effective Date, did not impose any obligation on Walmart or

Sam's to pay substantial rent during the Study Period.  Walmart or Sam's could have terminated the lease at any time.  It was not until the Rent Commencement Date, when the stores were actually built and operational, that plaintiffs became subject to significant contractual obligations, including the payment of hundreds of thousands of dollars in annual rent and penalties for default.  Walmart Lease §§ 3(b) & 17.  It would follow, then, that the Rent Commencement Date would mark the beginning of significant contractual obligations for the defendants too, including the grant of an option to purchase the property after ten years of rental income.

After reading the option clause as a whole and in the context of the entire lease, the Court finds that the language defining the Option Term is susceptible to more than one interpretation.  It is unclear from the lease language whether the Option Term, defined as "[f]rom the end of the tenth (10th) year of this Lease until the end of the eleventh (11th) year of this Lease," should be calculated using the Effective Date of the lease or the Rent Commencement Date of the lease.  Faced with this ambiguity, the Court must consider extrinsic evidence to resolve it.

Plaintiffs identify ample extrinsic evidence that shows the parties' intended that the timing of the Option Term should be calculated using the Rent Commencement Date.  In letters of intent exchanged by representatives of the parties during the early phase of lease negotiations, both sides proposed that the tenant "shall have a one-time option to purchase the Property" and that "Landlord will deliver notice to Tenant . . . prior to the end of the 10th anniversary of the Rent Commencement."  Ltrs. of Intent, ECF Nos. 55-14 to 55-17.  None of the letters of intent contemplated calculating the commencement of the "one-time option to purchase" from the date the ground lease was signed.  Indeed, the letters of intent, which proposed the "general terms and

conditions" of the ground lease, did not mention the term "Effective Date," but they did define the term "Rent Commencement."  Ltrs. of Intent.[9]

The parties' understanding in their pre-lease letters of intent was confirmed in documents they executed after the lease was signed.  During the lease's Study Period and before the Rent Commencement Date, the parties executed a Short Form Lease and Memorandum of Option, which stated that "[i]n the Lease the Lessor also grants the Lessee an option to purchase the Premises at a purchase price set forth in the Lease between the tenth (10th) and eleventh (11th) lease year" and that "[t]he Lease year shall begin on the Rent Commencement Date, as defined in the Lease, which is on or before the date on which the Lessee first conducts regular business on the premises."  ECF Nos. 55-5, 55-6.  The execution of the Short Form Lease and Memorandum of Option was contemplated by the lease, which states in relevant part: "The parties will, at the request of either, execute in duplicate a short form or memorandum of lease in recordable form setting forth the parties, term extension options, options to purchase, rights of first refusal and other provisions requested by Lessee."  Walmart Lease, § 24(f), at 15.  Although these documents state that the "Short Form Lease shall be used only for recording purposes and shall not supersede, amend nor replace any covenants of the Lease," they may serve as extrinsic evidence to define the terms in the lease.  *See Emcor Grp., Inc. v. Great Am. Ins. Co.*, No. ELH-12-0142, 2013 WL 1315029, at *9 (D. Md. Mar. 27, 2013) (noting that "'extrinsic sources' . . . that may be considered include 'an interpretation of the term employed by one of the parties before the dispute arose'" (quoting *Cole v. State Farm Mut. Ins. Co.*, 753 A.2d 533, 537 (Md. 2000)).  These documents, signed by

---

[9] In the letters of intent, the parties agreed that "Rent Commencement" was "[t]he earlier of (a) the date Tenant opens for business, or (b) 12 months after the date the Tenant obtains building permits." Ltrs. of Intent.  For purposes of the pending motions, this definition is materially the same as the definition of Rent Commencement Date in the lease.

representatives from both sides long before this dispute arose, establish that the parties believed the Option Term would begin at the end of the tenth year after the Rent Commencement Date. This makes sense. In many respects, the lease did not begin for plaintiffs or defendants until the Rent Commencement Date, because before that date, plaintiffs could have terminated the lease any time and defendants were receiving only nominal monthly rent payments of $100.00. *See* Walmart Lease § 3(b), at 4.

The deposition testimony offered by both sides does not provide much in the way of useful extrinsic evidence that would clarify by which date the Option Term should be calculated. However, the testimony of Quarterfield's Rule 30(b)(6) corporate designee, Brett N. Guy, is illuminating. Guy testified that Quarterfield wanted only to lease the property to Walmart and Sam's and that Quarterfield did not want to sell the property or even offer an option to purchase. Guy Dep. 55:11–57:20, ECF No. 55-12.[10] He believed it would be more profitable for Quarterfield to lease the property. *Id.* at 56:5–6, 18–21, 57:12–20 (stating that Quarterfield was "only interested in the leasing" because of "factors [including] the expenses associated with the site, the rent, the site contribution, . . . tax reasons, estate planning reasons, financing"). Guy's testimony is consistent with the extrinsic evidence that the parties understood the Option Term would not begin until ten years after the businesses were operational. This timing would ensure that Quarterfield received ten years of significant rental income before Walmart and Sam's could purchase the properties.[11] If the Option Term began ten years from the earlier Effective Date, which Quarterfield

---

[10] Walmart's real estate agent, M. John Meyer, provided a Declaration to the same effect, Meyer Decl. ¶ 4, ECF No. 55-13 ("Defendants were not interested in the sale of the property at that time. Therefore, the parties negotiated the ground leases with purchase options to be exercised by Walmart in the future.").

[11] It is undisputed that the language preventing the Option Term from beginning until Quarterfield provided notice was intended as a compromise between Quarterfield's reluctance to sell the properties and plaintiffs' eagerness to purchase the properties. *See* Pls.' Mem. 7; Defs.' Mem. 12.

now argues in apparent attempt to avoid a sale, Quarterfield would not have been guaranteed ten years of $772,021.34 annual rent from Walmart or ten years of $619,524.00 annual rent from Sam's before it might have to sell the properties. This is because when the lease was executed, the Rent Commencement Date was not a date certain. No one knew when it would be. It depended on when the Study Period concluded, and as it turned out, that took nearly three years. Therefore, the Rent Commencement Date did not occur until approximately three years after the contract was signed. If the commencement of the Option Term was calculated based on the date the lease was signed, not the date the stores opened for business, Quarterfield would have received only seven, not ten, years of substantial rental income before it was required to offer the properties for sale. The amount of pre-sale rental income for Quarterfield would have been even less if the Study Period had taken longer. That result, the Court is confident, was not intended by the parties.[12]

---

[12] Another reason why the Option Term should be calculated from the Rent Commencement Date, not the Effective Date, is that the option to purchase must be supported by substantial consideration. Here, the consideration for the lease was the rental income, which serves as consideration for the option as well. *See Hyatt v. Romero*, 58 A.2d 899, 902 (Md. 1948) ("[I]t is not necessary that the consideration shall have been given exclusively for the option. It is sufficient if it is one of the provisions of a contract for which consideration was given."); *Trotter v. Lewis*, 45 A.2d 329, 333 (Md. 1946) ("It is also recognized that where an option is incorporated in a lease, the privilege of becoming a purchaser of the property may be treated as part of the consideration supported by the rent, and the option can be held supported by valuable consideration."). Quarterfield, the reluctant landlord who did not want to sell its properties, bargained for at least ten years of substantial rental income before the option period began. This ten-year period of millions of dollars in rent was appropriate consideration for the option to purchase the properties.

Quarterfield has not offered any parol or extrinsic evidence to contradict the evidence offered by plaintiffs.[13]  ECF No. 56-5.  Based on the undisputed evidence in the record, the Court finds that the parties intended for the beginning of the one-year Option Term to be calculated from the Rent Commencement Date, not the Effective Date.  Accordingly, Walmart's Option Term could not commence any earlier than March 5, 2018, and Sam's Option Term could not commence any earlier than February 21, 2018.  Plaintiffs' attempts to exercise their options during the one-year Option Term were timely.

## IV.   Relief Requested

### A. Declaratory Judgment

The Court exercises its discretion to enter a declaratory judgment "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Championship Tournaments, LLC v. United States Youth Soccer Ass'n, Inc.*, No. SAG-18-2580, 2019 WL 6895876, at *2 (D. Md. Dec. 18, 2019) (citing *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)).  A declaratory judgment is warranted here.  The Court

---

[13] Quarterfield does offer an affidavit of its corporate representative Brett Guy in support of its position.  Plaintiffs argue that the sham affidavit rule bars consideration of Guy's November 13, 2019 affidavit because it supplies details that Guy stated he could not recall during his September 16, 2019 deposition.  Pls.' Opp'n & Reply 2–10.  Quarterfield counters that the affidavit is consistent and, where Guy could not recall details, those facts were not material.  Defs.' Reply 4–11.  The sham affidavit rule provides that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Zimmerman v. Novartis Pharm. Corp.*, 287 F.R.D. 357, 362 (D. Md. 2012) (quoting *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)).  Guy's affidavit is self-serving and provides little assistance to the Court.  For that reason, the Court need not decide whether the affidavit should be excluded under the sham affidavit rule.  In any event, the affidavit does not raise any genuine disputes of material fact or change the Court's analysis of the contract language and the uncontroverted parole and extrinsic evidence.

finds as a matter of law that, under Section 27 of Walmart's Lease and Sam's Lease, Quarterfield granted Walmart and Sam's valid and enforceable options to purchase the properties and that, when Walmart attempted to exercise its option on September 19, 2018 and Sam's attempted to exercise its option on January 24, 2019, their attempts were timely. Therefore, Walmart and Sam's have the right under their respective leases to purchase the properties in accordance with Section 27 of the lease and the Purchase Agreement. Accordingly, the Court will grant plaintiffs' motion and enter a declaratory judgment to that effect.

### B.  Specific Performance for Breach of Contract

Plaintiffs also seek summary judgment on their breach of contract claim for specific performance.  "To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001).  Specific performance is "an extraordinary equitable remedy" for breach of contract. *Cattail Assocs., Inc. v. Sass*, 907 A.2d 828, 844 (Md. Ct. Spec. App. 2006) (quoting *Archway Motors, Inc. v. Herman*, 378 A.2d 720, 724 (Md. Ct. Spec. App. 1977)).  It "may be granted, in the discretion of the chancellor, where more traditional remedies, such as damages, are either unavailable or inadequate," and it "has been particularly recognized as appropriate where the contract is for the sale of land because of the presumed uniqueness of land itself, no parcel being exactly like another." *Id.* (quoting *Archway*, 378 A.2d at 724)).

Here, Quarterfield promised Walmart and Sam's an option to purchase the properties ten years after the stores opened for business.  Quarterfield was obligated under the lease to provide Walmart and Sam's with notices of the option.  By refusing to issue the notices and refusing to negotiate the sale of the properties as they were required to do under the lease, Quarterfield has

breached the lease.  The Court will grant plaintiffs' motion as to this claim as well and order that Quarterfield execute the Purchase Agreement in accordance with Section 27 of the lease.

## **Conclusion**

In sum, the Court will grant plaintiffs' motion for partial summary judgment as to their declaratory judgment claim and their breach of contract claim for specific performance and deny Quarterfield's motion for summary judgment.  Plaintiffs' claim for damages for breach of contract remains pending.

A separate order will issue.

Date: <u>July 10, 2020</u>

                                          /S/

                                      Deborah L. Boardman
                                      United States Magistrate Judge

lyb

27